1

2   **E-Filed 10/12/2010**

3

4

5

6

7   IN THE UNITED STATES DISTRICT COURT

8   FOR THE NORTHERN DISTRICT OF CALIFORNIA

9   SAN JOSE DIVISION

10  FREDERICK VINCENT THIECKE,                    Case Number 05:06-cv-0161 JF/HRL

11          Petitioner,                           **ORDER**[1] **DENYING PETITION**
                                                  **FOR WRIT OF HABEAS CORPUS**
12      v.
                                                  Re: Docket Nos. 1
13  SCOTT M. KERNAN, Warden, California
    Department of Corrections, California State Prison -
14  Sacramento,

15          Respondent.

16

17          Petitioner Frederick Vincent Thiecke ("Thiecke") seeks a writ of habeas corpus.  He

18  claims that during his trial he was denied his rights under the Sixth and Fourteenth Amendments

19  of the U.S. Constitution.  For the reasons discussed below, the petition will be denied.

20                              **I.  BACKGROUND**[2]

21          It is undisputed that on the morning of March 5, 2000, Thiecke shot and killed his mother

22  and step-father, Libby and Dennis Green.

23          Libby Green had co-signed a loan for Thiecke's car, and she had made payments after

24  Thiecke fell behind on the loan.  However, on March 4, 2000, she allowed the car to be

25

26          [1]This disposition is not designated for publication in the official reports

27          [2]The following facts are summarized from the opinion of California Court of Appeal.  Pet
28  Ex. A at 1-9.  Citations to the record in the discussion refer to the Clerk's Transcript ("CT"),
    Resp. Ex. 1, and the Reporter's Transcript ("RT"), Resp. Ex. 2.

repossessed.  When he learned of the repossession, Thiecke, who had been staying with a friend in San Diego, became very upset.  Thiecke called his mother and threatened to kill her.  After taking a bus back to Vacaville, he stopped at the home of Anna Bonifacio, with whom his girlfriend was staying.  There he spoke to Lanie Murasko, Bonifacio's niece, saying, "[D]id you hear about what my mom did?  [. . .] She had my car repossessed. [. . .] [I'm] going to kill that bitch . . . . [I've] had eight or 12 hours on the bus to think about it."  He arrived at the Greens' house early on the morning of March 5.  Neighbors reported hearing raised voices and gunshots.  Dennis Green was found with four gunshot wounds, one each to the middle of the forehead, the left thumb, and the left and right sides of the head.  Libby Green had been shot twice in the head from close range.  The second shot entered the back of her head and appears to have been fired while she was on the floor.

Thiecke returned to the Bonifacios' house, and told his girlfriend that he had killed the Greens, taken care of the gun, and burned his clothes in the fireplace.  The two took a bus to San Diego, and from there received a ride to Tijuana.  They eventually made their way to Atlanta, where they were arrested four months after the shootings.  In July 2000, Anna Bonifacio found a gun buried in a planter box in her back yard; the remains of burned clothing were found in her fireplace.

Thiecke's defense focused on his mental state at the time of the crime.  Dr. David Foster, an expert in child and adolescent psychiatry and neurology, was the primary defense witness at both the guilt and sanity phases of the trial.  During the guilt phase, Dr. Foster testified that children subject to neglect and abuse commonly have significant alterations in their brain maturation and structure.  He concluded that Thiecke suffered from severe depression and mood instability, Post Traumatic Stress Disorder, and disassociative disorder.  He believed that Thiecke's illnesses amplified his "flight or fight" response, which could become very sensitive and was not controlled by rational thought processes.  He testified that Thiecke responded so strongly to the repossession because "the car symbolized his ideal self . . . and was one of the things he clung to as a reason to stay alive.  The car was also tied to his mother's deprivation and his mother's frequent taking from him and not giving to him . . . ."  On cross-examination, Dr.

2

1    Foster stated that Thiecke had explained to him that he took the gun to his mother's apartment in

2    order to scare her and make her realize the importance of what she had done, but when he got

3    there Dennis Green came after him, and he was startled and shot "again and again."  According

4    to Dr. Foster's testimony, Thiecke then said the gun went off when his mother tried to grab it

5    from him and that he shot her again because he was afraid she was in agony.

6           The jury found Thiecke guilty of two counts of first degree murder.

7           During the sanity phase, Dr. Foster testified that Thiecke was in an altered state of

8    consciousness when he killed the Greens.  He said that believed that crimes were not committed

9    out of anger, explaining that "there were multiple incidents where his mother had done much

10   worse to him than this, and he didn't respond in kind."  Dr. Foster also noted that witnesses had

11   said that Thiecke appeared to be acting in an altered state of mind at the time of the murders.  On

12   cross-examination, Dr. Foster acknowledged that Thiecke had been interviewed by another

13   psychologist, Dr. Datta, whom Thiecke had told that "he was going to go over there with that

14   gun and if the car issue didn't get resolved, he was going to kill" the Greens.  Dr. Foster did not

15   consider the statement significant, noting that "in a confused state[] you can want to do all kinds

16   of things."  Dr. Foster also testified on cross-examination that Thiecke had obtained the gun

17   because he was selling drugs and had ingested about a gram of methamphetamine before he went

18   home.  He testified, on redirect, that Thiecke had started using methamphetamines with his

19   mother and step-father when he was about eighteen.

20          The defense also called DJ Strickland, the friend with whom Thiecke was staying in San

21   Diego, who testified that Thiecke was "real depressed" and "would be talking to you and kind of

22   like space off and lose concentration."  Strickland recalled that Thiecke became extremely upset

23   when he learned of the repossession.  Barbara Schmidt, Thiecke's paternal aunt, also testified for

24   the defense, stating that Thiecke's parents would leave him alone in the house when he was four

25   or five, and that in the months before the murders Thiecke was upset and high strung.

26          The jury found Thiecke sane at the time of the murders.

27          Thiecke appeal his conviction to the California Court of Appeal, which affirmed the

28   conviction in all respects on June 25, 2004.  Thiecke's petition for review by the California

3

1  Supreme Court was denied October 13, 2004.  The instant petition was timely filed on January

2  10, 2006.[3]

3  ## II.  LEGAL STANDARD

4  Applications for a writ of habeas corpus on behalf of prisoners in custody subject to the

5  judgment of a state court are governed by the Antiterrorism and Effective Death Penalty Act of

6  1996 ("AEDPA").  Under AEDPA, a federal court reviews only the reasoning of highest state

7  court to issue a reasoned opinion addressing the petitioner's federal claim.  28 U.S.C. § 2254(d);

8  *see also Mendez v. Knowles*, 556 F.3d 757, 767 (9th Cir. 2009) (noting that a court must "look

9  through" any unexplained orders to analyze the last reasoned opinion reaching the merits of the

10  federal claim). The federal court may not grant a writ of habeas corpus unless the state court's

11  adjudication was either: (1) contrary to, or involved an unreasonable application of, clearly

12  established federal law, as determined by the Supreme Court of the United States; or (2) based

13  on an unreasonable determination of the facts in light of the evidence presented at the state court

14  proceeding.  28 U.S.C. § 2254(d)(1)-(2).

15  The Supreme Court has held that there is a difference between "contrary to" clearly

16  established law and an "unreasonable application" of that law under § 2254(d).  *Williams v.*

17  *Taylor,* 529 U.S. 362, 404 (2000).  A decision is "contrary to" established federal law where

18  either the state court's legal conclusion is contrary to that of the Supreme Court on a point of

19  law, or is materially indistinguishable from a Supreme Court case, yet the legal result is opposite.

20  *Id.* at 404-05.  Conversely, an "unreasonable application" of established law applies where the

21  state court identifies the correct governing legal rule from Supreme Court cases, yet

22  unreasonably applies it to the facts of the particular state case.  *Id.* at 406.  Furthermore, the

23  petitioner must do more than merely establish that the state court was wrong.  *Id.* at 409-10.  He

24  must prove that the state court's application of clearly established federal law was objectively

25  _____

26  [3]The one-year period for filing a federal habeas corpus action commenced on January 11,
   2005, after the expiration of the ninety-day period available for purposes of seeking direct

27  review by the United States Supreme Court of a final state court judgment of conviction. 28
   U.S.C. 2244(d)(1)(a); *Clay v. United States*, 537 U.S. 522 (2003); *Bowen v. Roe*, 188 F.3d 1157

28  (9th Cir. 1999).

4

1  unreasonable. *Id.* (stating "a federal habeas court . . . should ask whether the state court's

2  application of clearly established federal law was objectively unreasonable. The federal habeas

3  court should not transform the inquiry into a subjective one.").

### III. DISCUSSION

5  Thiecke contentions of constitutional violations fall into three categories. First, he argues

6  that his right to present a defense, which the Supreme Court has acknowledged is protected by

7  both the Sixth Amendment right to compulsory process and the Due Process Clause of the

8  Fourteenth Amendment, was violated by trial court rulings that excluded defense evidence.

9  Second, Thiecke contends that his Fourteenth Amendent right to due process and a fair trial was

10  violated by misconduct on the part of the prosecutor. Third, he claims that his Sixth Amendment

11  right to effective assistance of counsel was violated by his trial counsel's failure to object to the

12  prosecutor's misconduct. The California Court of Appeals issued a reasoned opinion as to each

13  of these issues. After reviewing that opinion under the highly deferential standard of review

14  established by AEDPA, this Court finds no constitutional violation warrants habeas corpus relief.

15  **A. Exclusion of Evidence**

16  Thiecke contends that the trial court violated his constitutional rights by excluding

17  evidence critical to his defense, by (1) placing improper limits on the testimony of his expert

18  witness, (2) improperly excluding as prejudicial evidence of bad acts by the victims, and (3)

19  rejecting evidence regarding the nature of his relationship with the victims.

20  A federal court may not collaterally review a state court evidentiary ruling unless the

21  ruling violates federal law, either because it runs afoul of a specific constitutional provision or it

22  infringes the due process right to a fair trial. 28 U.S.C. §2254(a); *Rivera v. Illinois*, 129 S. Ct.

23  1446, 1454 (2009). Generally, states "have broad latitude . . . to establish rules excluding

24  evidence from criminal trials," although that discretion does have constitutional limits. *Holmes*

25  *v. South Carolina*, 547 U.S. 319, 324 (2006). The Supreme Court has established that,

26  "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the

27  Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution

28  guarantees criminal defendants a meaningful opportunity to present a complete defense." *Id.*

5

1   (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).  That right is violated by evidentiary

2   rulings that "infringe upon a weighty interest of the accused" and are "arbitrary or

3   disproportionate to the purposes they are designed to serve."  *Id.* (internal quotation marks

4   omitted).

5       The Supreme Court has consistently upheld limits based on traditional evidentiary rules.

6   "Well-established rules of evidence permit trial judges to exclude evidence if its probative value

7   is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or

8   potential to mislead the jury."  *Id.* at 326; *see also Montana v. Egelhoff*, 518 U.S. 37 (1996)

9   ("The accused does not have an unfettered right to offer evidence that is incompetent, privileged,

10  or otherwise inadmissible under standard rules of evidence." (quoting *Taylor v. Illinois*, 484 U.S.

11  400 (1988)) (alterations omitted)).  The question this is whether the state appellate court applied

12  evidentiary rules that "serve no legitimate purpose or disproportionate to the ends they are

13  asserted to promote," *Holmes*, 547 U.S. at 326, or the exclusion of evidence "offends some

14  principle of justice so rooted in the traditions and conscience of our people as to be ranked as

15  fundamental." *Egelhoff*, 518 U.S. at 47.  It is the defendant, not the state, who bears the "heavy

16  burden" of demonstrating that the evidentiary rule violated a fundamental principle of justice.

17  *Id.* at 43.

18  **1.  Limitations on Expert Testimony**

19      Thiecke contends that the trial court improperly restricted the testimony of Dr. Foster

20  with respect to the statements on which Dr. Foster based his opinion.  He claims that the trial

21  court's limitations on the substance of the psychiatric testimony infringed his right to present a

22  defense, and that the trial court's inconsistent application of those limitations prevented him

23  from obtaining a fair trial.

24      **a.  Relevant Facts**

25      Prior to Dr. Foster's testimony, the prosecutor sought to limit the discussion of the bases

26  of the doctor's opinions.  The prosecutor argued that the defense could "list the documents,

27  reports, interviews, and records upon which his opinion relied," but could not "got into the detail

28  of the hearsay information that they provided."  RT 789. The prosecution relied on California

6

1   caselaw holding that "[a]n expert cannot be utilized to testify to otherwise inadmissible hearsay

2   under the rationale that the hearsay serves as a 'basis' for the expert's opinion."  CT 618 (citing

3   *People v. Coleman*, 38 Cal. 3d 69 (1985)).   The trial court did not make a global ruling

4   regarding such reliance on hearsay;[4] instead it had portions of Dr. Foster's proffered testimony

5   read back and allowed the parties to make specific objections.  RT 786.  The court sustained an

6   objection to testimony about Thiecke's childhood abuse and neglect that provided the basis for

7   Dr. Foster's diagnosis of PTSD.  RT 789.  Dr. Foster stated that Thiecke himself did not

8   acknowledge much physical abuse, but that "other witnesses note that he was thrown across the

9   room, against a wall; that he was constantly berated and demeaned and told he was not wanted

10  and hated."  RT 773 (proffered testimony of Dr. Foster).

11          On direct examination, the court twice sustained objections to the admission of details of

12  the scientific studies on which Dr. Foster based his opinion.  RT 806 (sustaining objection to

13  details from literature showing how abuse causes brain changes); RT 814 (sustaining objection

14  to discussion of studies showing that neglect had even more psychological effects than abuse);

15  RT 818 (sustaining objection to details of autopsy studies showing depletion of major

16  neurochemicals in those who have committed violence).  The prosecution also objected to

17  defense questioning of Dr. Foster regarding the significance of the promised car in the context of

18  Thiecke's personality disorder.  The trial court allowed the question to stand, but when Dr.

19  Foster answered that "[i]n Mr. Thiecke's case, he states that he considered it like his baby," the

20  court granted the prosecution's motion to strike.  RT 825.  After the question was reframed to

21  reference material in the record, Dr. Foster was allowed to testify that "[t]he car symbolized Mr.

22  Thiecke's ideal self and the way he would like to be treated . . . .  The car also was tied to his

23  mother's deprivation and his mother's frequent taking from him and not giving to him . . . ."  RT

24  826.

25

26          [4]Before the state appellate court, Thiecke argued that trial judge had issued a "blanket
    prohibition" barring Dr. Foster from discussing any hearsay information upon which he had
27  relied.  Pet. Ex. A at 11.  Before this Court, he argues only that the trial court's rulings
    cumulatively amounted to such a prohibition.  *See* Pet. at 4; Pet. Traverse at 4.
28

                                                   7

1    On both cross-examination and redirect examination, the trial court admitted greater

2    detail with respect to the bases of Dr. Foster's opinions.  The court allowed both the prosecution

3    and defense to elicit statements that Thiecke made to Foster regarding the shooting itself.  *See*

4    RT 919-24, 929-30.  The court also allowed the prosecution to quote from the diagnostic and

5    statistical manual (DSM).  RT 866.  Thiecke identifies several additional references to the

6    statements of other witnesses, medical reports, and forensic evidence that were elicited on cross

7    examination, Pet. Traverse at 5-6; it should be noted, however, that many of these statements

8    were not subject to defense objections to at trial.  The only hearsay objection raised on redirect

9    examination was to Dr. Foster's response to a question: "[H]ow is it possible that someone who

10   loves someone else can do something" as horrible as murdering them.  Dr. Foster's truncated

11   response, which began, "Well, in – in many ways its possible if – as some family members

12   indicated, she was – she –." RT 932.  The court sustained the objection.  *Id.*

13   During the sanity phase, the prosecution again objected to hearsay testimony concerning

14   Thiecke's statements about the car and the shooting.[5]  The court also sustained an objection to

15   Dr. Foster's testimony concerning the details of the descriptions witnesses had given about

16   Thiecke's appearance around the time of the shooting, but it told defense counsel to "lay a

17   foundation" in regard to "insanity at the time of the event," and the defense was able to elicit

18   much the same information.  RT 185.  The trial court overruled a hearsay objections regarding

19   the anti-psychotic medication Thiecke recieved from the jail physician.  RT 1186.  It also

20   allowed Dr. Foster to testify that Thiecke "has a long history of having been severely provoked

21   by his mother and others for a very long time before that without responding this way.  So there .

22   . . are multiple incidents where his mother has done much worse to him than this, and he didn't

23

24

25   [5]The trial court sustained the objection to the question, "Can you tell me what Mr.
     Thiecke told you about the incident?"  RT 1186.  It should be noted, however, that the court

26   stated explicitly that the objection was sustained "[a]s to that question, *as phrased*," and that
     immediately prior to that exchange defense counsel told the court "I'm going to ask him what

27   Mr. Thiecke told him about the incident," to which the court responded, "Go ahead."  RT 1185-
     86 (emphasis added).  The is no indication in the transcript that defense counsel pursued another

28   avenue of eliciting the testimony.

8

1    respond in kind." RT 1191.  On cross examination, the court again admitted greater detail into

2    the hearsay bases of Dr. Foster's opinions.

3        **b. Exclusion Error**

4        Thiecke argues that the trial court's rulings amounted to a "total preclusion" of important

5    information on which Dr. Foster relied.  He contends that there was no way that the jury "would

6    have given Dr. Foster the time of day without hearing the central basis for his conclusions."  Pet.

7    Traverse at 11.  He claims that this error rises to constitutional dimensions because the defense

8    case rested on Dr. Foster's testimony.

9        The California Court of Appeal found that the trial court's rulings were within the

10   reasonable exercise of its discretion and that any error was harmless.  *See* Pet. Ex. A at 13.  The

11   appellate court clearly articulated the rule that it applied:

12       An expert witness whose opinion is based on . . . inadmissible matter can, when
         testifying, describe the matter that forms the basis of the opinion. . . . A trial court
13       . . . has discretion to weigh the probative value of inadmissible evidence relied
         upon by an expert witness . . . against the risk that the jury might improperly
14       consider it as independent proof of the facts recited therein.

15   *Id.* at 11 (citing *People v. Valdez*, 58 Cal. App. 4th 494, 510 (1997)) (emphasis and citations

16   omitted).  The court recognized the rule's rationale that "a witness's on-the-record recitation of

17   sources relied on for an expert opinion does not transform inadmissible matter into 'independent

18   proof' of any fact."  *Id.*  It also emphasized that "[w]ell-established authority confers

19   considerable discretion upon the trial court to regulate testimony in this area."  *Id.* at 12.

20       On habeas review, this Court will find a constitutional violation regarding the exclusion

21   of a defense evidence only if the state evidentiary rule served no legitimate purpose or was

22   disproportionate to the ends asserted or if the rule offends a fundamental principle of justice.

23   Here, there is no question that a rule limiting an experts repetition of otherwise inadmissible

24   hearsay testimony serves a legitimate purpose in ensuring that only reliable testimony is

25   presented to the jury.  *See* Fed. Rule Evid. 703 (data underlying expert testimony only admissible

26   on direct examination if the "probative value in assisting the jury to evaluate the expert's opinion

27   substantially outweighs their prejudicial effect"); *see also Egelhoff*, 518 U.S. at 42 ("Hearsay

28   rules similarly prohibit the introduction of testimony which, though unquestionably relevent, is

9

1  deemed insufficiently reliable.")  Thiecke admits as much in his petition: "The trial court was

2  entitled to place reasonable limits on Dr. Foster's description of the hearsay bases of his expert

3  opinion."  Pet. at 9.

4       Nor was the application of the rule in this case by the state appellate court objectively

5  unreasonable.  The court noted correctly that much of the testimony at issue ultimately was

6  presented to the jury, including Thiecke's feelings about his car, the details of the shooting,

7  Thiecke's relationship with his mother, and Thiecke's appearance the day of the shooting.  Pet.

8  Ex. A at 12-14.  While Thiecke argues that "the expert should have been able to describe

9  Thiecke's history of physical and psychological abuse and neglect, the nature of the relationship

10  between Thiecke and his mother, and Libby Green's life-long drug abuse," he claims only that

11  the state "fails . . . to explain why the jury would have given Dr. Foster the time of day without

12  ever hearing the central basis for his conclusions."  Pet. Traverse at 10-11.  Thieck

13  misapprehends the heavy burden placed on a federal habeas petitioner with respect to claims

14  based on evidentiary rulings.  *See Boyde v. Brown*, 404 F.3d 1169, 1172 (9th Cir. 2005).  Indeed,

15  the one area in which the trial court arguably ered–its limitation of testimony about Thiecke's

16  childhood abuse–is one in which the court gave a clear reason–Thiecke's own denials–for

17  doubting the reliability of the underlying hearsay: because Thiecke himself denied it.  *See* RT

18  773, 789.

19      **c.  Inconsistent Rulings**

20       Thiecke next contends that the trial court abused its discretion by allowing the

21  prosecution greater leeway on cross-examination of Dr. Foster than it allowed the defense on

22  direct examination.  Both Respondent and the state appellate court recognize that "during the

23  trial, the court occasionally applied its rulings on the admissibility of hearsay inconsistently."

24  Answer at 12; *see also* Pet. Ex. A at 16.

25       Thiecke claims that these inconsistencies amounted to a violation of his right to a fair

26  trial.  He cites *Wardius v. Oregon*, 412 U.S. 470, 474 (1973), for the proposition that the Due

27  Process Clause speaks "to the balance of forces between the accused and the accuser."  In

28  *Wardius*, the Supreme Court invalidated an Oregon statute granting broader discovery rights to

the prosecution than the defense.  *Id.* at 472.  The Court held that the state must make a "strong showing of state interest" in order to provide greater discovery to the prosecution than to the defense.  *Id.* at 475.  Here, the state appellate court concluded that the trial court granted the prosecutor broader leeway not in discovery, but on cross examination of Theick's mental health expert.

Under California law, "while an expert witness may not on direct examination, reveal the contents of reports or opinions expressed by nontestifying experts, 'this rule does not preclude the cross-examination of an expert witness on the contents of such reports.'"  Pet. Ex. A at 15-16 (quoting *People v. Campos*, 32 Cal. App. 4th 304, 308 (1995)).  Trial courts traditionally have given "*both parties* considerable scope in cross examining experts to test their credibility."  *Id.* (emphasis added).  This practice is consistent with the Federal Rules of Evidence, which restrict the presentation of otherwise inadmissible evidence underlying an expert's opinion *by the proponent,* but explicitly provide that "the expert may . . . be required to disclose the underlying facts or data on cross examination."  Fed. R. Evid. 703, 705.  The rule applied by the state appellate court is neither arbitrary nor fundamentally unfair.

Nor was the state court's application of the law objectively unreasonable.  As noted by the appellate court,  Thiecke conceded that "the trial court permitted defense counsel to elicit similar hearsay information from Dr. Foster on redirect examination."  Pet. Ex. A at 16; *see also* Pet. Traverse at 6 ("Having gone into great detail about statements by Thiecke to Foster, the prosecutor now did not object to similar questions by defense counsel on redirect.").  The Court of Appeal found that "what and how much hearsay detail to permit in the examinatination of experts is, by nature, one fraught with the need for judgment calls and the drawing of lines through grey areas," and that in light of the information that the defense was allowed to elicit, the trial court's rulings could not be said to abuse that discretion.   Pet. Ex. A at 16.  This application of California's evidentiary rules was not objectively unreasonable.

**2.  Exclusion of Evidence Regarding the Victims' Background and Lifestyle**

Thiecke contends that the trial court erred in excluding evidence of the Greens' drug use, possession of pornographic videos, and criminal conduct.

11

1    The prosecution moved to exclude as irrelevent and prejudicial: (1) evidence of traces of

2    methamphetamine revealed in the autopsies of Libby and Dennis Green, (2) pornographic

3    videotapes found in the Greens' apartment, and (3) evidence that, five or six years prior to the

4    shooting, Libby Green had solicited the murder of a previous husband. *See* CT 377-383, CT

5    546-550.  The defense argued that the evidence was relevant to Thiecke's mental state because

6    "the relationship between Mr. Thiecke and his mother profoundly influenced Mr. Thiecke's state

7    of mind as he was growing up, and dramatically affected his state of mind on the morning" of the

8    shootings.  CT 528.  The defense also argued that the evidence of drug use was relevant to

9    support Thiecke's claim that the killings were the result of a confrontation that got out of hand,

10   and thus were not premeditated first degree murders.  *Id.*  Defense counsel was "perfectly frank

11   and blunt" that the evidence would "dirty the victim."  RT 26.

12   The trial court ruled that all of the proffered evidence was inadmissible, finding that the

13   proffered evidence was not relevant and "[t]here was no rational or logical connection between

14   the proffered testimony and the issues in the case . . . ."  RT 754-55.  The trial court noted that

15   the defense had not raised the issue of mistake or self-defense, and found that the evidence was

16   not relevant to defense claim of diminished capacity.  *Id.*

17   Applying California Evidence Code § 352, which provides that even relevant evidence

18   properly may be excluded if its probative value is substantially outweighed by the probability

19   that its admission will create a substantial danger of undue prejudice, confuse the issues, or

20   mislead the jury, the state appellate court concluded found that the trial court "reasonably found

21   the link between the proffered evidence and the points it was offered to establish to be

22   inadequate."  Pet. Ex. A at 18.  In particular, the Court of Appeal found that the traces of

23   methamphetamine and the pornographic videos were, "at best, only marginally related" to

24   defense claims that Theicke's "home environment as he was growing up was permeated with

25   drug use and pornography," or that the Greens acted in a provactive matter on the morning of the

26   shootings.  *Id.* at 18-19.  It found the relevance of Libby Green's alleged attempt to solicit her

27   former husband's murder even more attenuated.  *Id.*  Finally, it noted that even defense counsel

28   acknowledged "the point of the offer was to 'dirty up' the victim."  *Id.*

12

1    The Supreme Court has recognized explicitly that a defendant's presentation of evidence
2    may be restricted under "[w]ell-established rules of evidence permit[ing] trial judges to exclude
3    evidence if its probative value is outweighed by certain other factors such as unfair prejudice,
4    confusion of the issues, or potential to mislead the jury." *Holmes*, 547 U.S. at 326.  California
5    Evidence Code § 352, which serves the same function as Federal Rule of Evidence 403, is well
6    established and neither arbitrary or fundamentally unfair.

7    Nor was the state appellate court's application of the rule objectively unreasonable.
8    Thiecke argues that "*if* [Libby Green] habitually used drugs, *if* she were a sociopath–that i.e.,
9    solicited the murder of her husband–that was powerful evidence supporting Dr. Foster's
10   diagnosis" of Thiecke as having PTSD.  Pet. Traverse at 22.  He does not, however, address the
11   state appellate court's conclusion that the evidence of drugs in the victims' bloodstream and of
12   the alleged solicitation were only marginally relevant to his claims regarding his "homelife
13   growing up" or Libby Green's "history of sociopathic behavior."  Pet. Ex at 19.  Nor does he
14   address the court's concern that admission of the evidence would lead to a "substantial danger of
15   diverting the jury's attention to extraneous and prejudicial matters."  *Id.*

16   **3.  Evidence About Defendant's Childhood**

17   Thiecke claims that the state appellate court committed constitutional error by prohibiting
18   him from introducing evidence of "the history of abuse and conflict" between himself and the
19   Greens.  While Thiecke admits that questions of prosecution witnesses by defense counsel
20   regarding longstanding problems between Thiecke and his mother were properly objected to as
21   beyond the scope of direct examination, he argues that the trial court erred in excluding
22   testimony regarding the same issues when it was presented by defense witnesses on direct
23   examination.  Pet. Traverse at 25.

24   The first defense witness was Thiecke's friend, DJ Strickland.  Strickland was questioned
25   regarding his opinion of Thiecke's character for violence.  When asked if he ever saw a fight
26   between Thiecke and someone else, he answered, "only with his mom and step-dad."  RT 732.
27   The defense followed up by asking what Strickland saw, and the prosecutor's objection on the
28   grounds of relevance was sustained.  *Id.*  The defense then asked "to make an offer of proof,"

13

1   claiming that the testimony was relevant to Strickland's opinion: "It goes to the basis of his

2   opinion, the strength of his opinion, why he has this opinion." *Id.*  The defense then called Lanie

3   and Danny Murasko, who also testified Theicke was not a violent person.  Neither was asked

4   about Thiecke's relationship with the Greens.

5       During the examination of the next witness, in the context of argument on the

6   admissibility of evidence that Libby Green solicited to kill her previous husband, defense

7   counsel claimed that "the court has ruled for every one of my witnesses–the last three witnesses

8   who wanted to go into the relationship between parties, which . . . the court has ruled out."  RT

9   754.  The court excluded the evidence without commenting on defense counsel's claim that he

10  had been prohibited from exploring the relationship between Thiecke and his mother.  During

11  the cross-examination of Dr. Foster, the prosecutor asked whether Dr. Foster had interviewed the

12  victims' families.  Defense counsel commented that the prosecutor's question "opens the door"

13  to defense questions regarding Thiecke's relationship with the victims. RT 863.  The court

14  allowed the question without responding to defense counsel, and neither counsel pursued the

15  issue further.

16      Prior to the sanity phase of the trial, defense counsel asked the court "for a reaffirmation

17  of a ruling that the court made during the trial phase, which [was that] the witnesses are not

18  allowed . . . to testify about the relationship between the defendant and his mother."  RT 1146.

19  The prosecutor responded that the rulings in question involved questions asked by defense

20  counsel during the prosecution's case that were beyond the scope of direct examination.  *Id.*  The

21  court declined to issue any "reaffirmation," stating that "the record speaks for itself about . . .

22  evidentiary rulings that were made."  RT 1147.  Defense counsel indicated that he did not want

23  to bring the character witnesses back if they would not be able to testify about Mr. Thiecke's

24  relationship with his mother.  The trial court told defense counsel that the court would rule on

25  objections as they were raised.  *Id.*  Later, before the defense called the "relationship" witnesses,

26  the court stated that "[i]t doesn't immediately come to mind what the relevance is of the

27  observations by the witnesses about the relationship between Mr. Thiecke and his mother."  RT

28  1259.  Defense counsel offered to prove that the witnesses to incidents of abuse and neglect

14

1   could show that Dr. Foster's opinion that Thiecke suffered from PTSD was based in fact.  *Id.*

2   The court determined that it would not make a blanket ruling but listen and make an assessment

3   on a question by question basis.  RT 1263.

4        The defense then called DJ Strickland.  He testified that Thiecke was depressed during

5   the week he spent in San Diego in March 2000 and became very upset after talking to his mother

6   the day before the killings.  Strickland was not asked any questions about Thiecke's relationship

7   with his mother.  The defense next called Barbara Schmidt, Thiecke's paternal aunt.  When she

8   was asked about her relationship with Libby Green; the prosecutor objected on the grounds of

9   relevance.  RT 1275.  The court sustained the objection, but it told defense counsel he could

10   continue to ask questions about foundational issues.  *Id.*  Ms. Schmidt was allowed to testify that

11   she had found Thiecke left home alone by his parents when he was four or five years old, but the

12   trial court sustained an objection as to how often this occurred.  RT 1276.  Schmidt was allowed

13   to testify that on those occasions she took Thiecke to her home, and the situation continued after

14   Libby Green and Thiecke's father were divorced.  There were no further objections regarding

15   relevance and Schmidt went on to testify about her relationship with Thiecke after he came to

16   live with her when he was eighteen.

17        As the state appellate court recognized, the trial court did not rule that all testimony about

18   conflict between defendant and the Greens was categorically irrelevant.  The Court of Appeal

19   noted that when the prosecution objected to Strickland's statement about Thiecke's fights with

20   his mother and step-father, defense counsel argued that the testimony was relevant to

21   Strickland's opinion of Thiecke as non-violent person–not to Theicke's relationship with his

22   mother.  It also observed that counsel did not ask another question about Thiecke's relationship

23   with his mother during the guilt phase, and the only other testimony excluded as irrelevant was

24   Barbara Schmidt's testimony concerning how frequently defendant was left alone as a child.

25   Pet. Ex. A at 22.  The state appellate court agreed with Thiecke that this evidence should have

26   been admitted.  *Id.*  However, it determined that "[i]n light of all the other evidence, this

27   additional detail would not have altered the jury's evaluation of the defense."  *Id.*  The court

28   rejected Thiecke's broader assertion that the outcome would have been different if additional

15

1   questions about his childhood had been allowed.  Viewed in light of the highly-deferential

2   AEDPA standard, those determinations were not unreasonable.

3   **B.  Prosecutorial Misconduct**

4          Thiecke argues that the prosecutor engaged in misconduct by referring inappropriately to

5   Thiecke's alleged gang and drug activity, by misstating the law during closing argument, by

6   disparaging defense counsel, and by vouching.  However, several of these claims are foreclosed

7   because there was no objection at trial to the prosecutor's actions.

8          On habeas review of a prosecutorial misconduct claim, the court may grant relief only if

9   the misconduct rises to the level of a due process violation–not merely because it might

10  disapprove of the prosecutor's behavior. See *Sechrest v. Ignacio*, 549 F.3d 789, 807 (9th Cir.

11  2008).  The relevant question is whether a prosecutor's comments "so infected the trial with

12  unfairness as to make the resulting conviction a denial of due process." *Tak Sun Tan v. Runnells*,

13  413 F.3d 1101, 1112 (9th Cir. 2005) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

14  The court must first determine whether the prosecutor's actions were improper and, if so,

15  whether they infected the trial with unfairness.  *Id.*  In considering the fairness of a trial, a

16  reviewing court should consider: (1) whether the prosecutor's behavior manipulated or misstated

17  the evidence, (2) whether the trial court gave a curative instruction, and (3) the weight of the

18  evidence against the accused.  *Id.* at 1115.  The Ninth Circuit has held that failure to comply with

19  California's contemporaneous objection rule results in a procedural default of a prosecutorial

20  misconduct claim. *Howard v. Campbell*, 305 Fed. Appx. 442, 444 (9th Cir. 2008); *Rich v.*

21  *Calderon*, 187 F.3d 1064, 1069-70 (9th Cir. 1999). Because the state's procedural default rule

22  would require the same result whether or not the federal claim were meritorious, it is an adequate

23  and independent ground supporting the judgment that bars federal habeas relief. *Coleman v.*

24  *Thompson*, 501 U.S. 722, 729-32, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Howard*, 305

25  Fed. Appx. 442 at 444.

26  **1.  References to Gangs**

27          While cross-examining Sean Maletsky, who had testified that Thiecke was a nonviolent

28  person, the prosecutor asked, "Would it surprise you to know that there's pictures of him holding

16

1 a gun with another guy flashing some gang sign over a dead rabbit?" RT 940.  Defense counsel

2 objected, and the trial court sustained the objection. *Id.*  Later, at defense counsel's request , the

3 trial court gave the jury a curative instruction noting specifically that "[i]n this trial, there has

4 been no evidence of [Thiecke] or any other individual being involved in any type of gang

5 activity.  Do not assume to be true any insinuation suggested by a question asked a witness. . . .

6 Do not consider for any purpose any offer of evidence that was rejected or any evidence that was

7 stricken by the court."  RT 1023-24.

8       The California Court of Appeal held that "in the absence of a contrary indication in the

9 record," the court would presume that the jury heeded the admonition and that the error was

10 cured. Pet. Ex. A at 27. This rule is entirely consistent with clearly established Supreme Court

11 precedent that presumes that jurors follow the court's instructions absent extraordinary situations.

12 *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985); *Tak Sun Tan*, 413 F.3d at 1112.  The state

13 appellate court's determination that there were no contrary indications in the record here was not

14 unreasonable.

15 **2.  References to Petitioner's Drug Dealing**

16       During the sanity phase of trial, Dr. Foster testified that Thiecke was "out of his mind" at

17 the time of the killings.  *See* RT 1216, 1217.  On cross-examination, the prosecutor reviewed

18 with Dr. Foster a number of deliberate acts that Thiecke had committed prior to the killings.  The

19 prosecutor asked if Thiecke had "chose[n] an optimal weapon" to kill the Greens. RT 1226.  Dr.

20 Foster replied, "I don't know that he chose the weapon, no. . . . He had a weapon that ended up

21 doing the job." RT 1226.  Responding to a follow-up question, Dr. Foster stated that Thiecke

22 had a gun that he carried everywhere because "he walked through a very rough neighborhood,

23 and he was – he said he was extremely terrified and frightened that night."  RT 1226.  This

24 colloquy led to the following exchange:

25       Q.  You said he always carried this gun?  Did you say that?

26       A.  When he was traveling through those parts of town, I believe he did yes.

27       Q.  Well, he got the gun because he was dealing dope, right?

28       A.  I believe that's right.

17

1     Q.  So what–

2     [DEFENSE COUNSEL]: Your Honor, I think that question is an improper question.

3     THE COURT: Ok.  The question and answer will stand.  Next question.

4     Q.  Specifically, he told you that he originally acquired that dope–that gun because he

5  was   dealing dope and wanted it for protection, right?

6  RT 1229.  The prosecutor then asked a number of other questions about Theicke's drug use and

7  sales in San Diego during the week before the shooting.  *See* RT 1229-1231.

8     Thiecke contends that these questions were prejudicial because they suggested that he

9  was a drug user and dealer.  The Court of Appeal concluded that although reasonable minds

10  could differ "as to the precisely proper scope of this examination," the matter "fell squarely

11  within the [trial] court's discretion."  Pet. Ex. A at 27.  It also held, "arguendo," that any error

12  was harmless.  *Id.*

13     Given the broad discretion trial courts must have in balancing the probative value of

14  evidence against its prejudicial effect, this Court concludes that the conclusion of the state

15  appellate court was reasonable.  The defense itself had put Thiecke's drug use at issue by

16  eliciting testimony from Dr. Foster about the effect of drugs on the brain.  RT 1234.  How

17  Thiecke came to possess the gun was also relevant, particularly after Dr. Foster testified about

18  Thiecke's claim that he needed the gun because he walked through a bad neighborhood.

19  **3.  Foreclosed Claims**

20     Thiecke contends that the prosecutor made legal misstatements during his guilt phase

21  closing argument that mental illness does not "give you a white card so you can go out and

22  murder people," and that "[t]his isn't some brain dead maniac out there who you give a break to.

23  These are executions."  RT 1080-1081.  Thiecke also argues that the prosecutor engaged in

24  similar misconduct during the sanity phase of the trial.  The prosecutor stated, "You are here to

25  determine whether or not we are going to hold [defendant] criminally responsible for the crimes .

26  . . that he committed on March 5th or we're going to let him get away to a mental hospital with

27  no criminal responsibility ever."  RT 1335  He also contends the prosecutor engaged in improper

28  vouching: "You want to talk about justice?  [Defense Counsel] told you I'm paid to get up here

1   and advocate to you that this defendant is sane.  That's not true either.  I'm a prosecutor, *I'm*
2   *paid to put on the truth and do justice*."  RT 1364 (emphasis added).

3        The California Court of Appeal did not address these contentions because Thiecke "failed
4   to preserve them by objecting at trial, and there is no indication that objections would have been
5   futile or would not have cured the alleged harm."  Pet. Ex. A at 27.  In the Ninth Cicruit, "failure
6   to comply with California's contemporaneous objection rule results in a procedural default of a
7   prosecutorial misconduct claim." *Howard v. Campbell*, 305 Fed. Appx. 442, 444 (9th Cir. 2008);
8   *Rich v. Calderon*, 187 F.3d 1064, 1069-70 (9th Cir. 1999).

9   **B.  Ineffective Assistance of Counsel**

10       Thiecke finally contends that his trial counsel's failure to object to several aspects of the
11  prosecutor's alleged misconduct amounted to deprivation of effective assistance of counsel.

12       The framework for analyzing claims of ineffective assistance of counsel is articulated in
13  *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Williams*, 529 U.S. at 390 (applying
14  *Strickland* as the "clearly established federal law" that governed petitioner's
15  ineffective-assistance claim).  The Court held that an attorney's inadequate representation does
16  not rise to the level of a constitutional violation unless the deficiency so infected the adversarial
17  process as to raise doubts about the reliability of the proceeding's outcome.  *Id.* at 687.
18  *Strickland* creates a two-prong test.  To prevail on a claim of ineffective assistance of counsel, a
19  defendant must prove (1) that his counsel's performance was deficient, and (2) that he suffered
20  prejudice as a result.  *Id.*  To be deficient, an attorney's conduct must fall below an "objective
21  standard of reasonableness" established by "prevailing professional norms." *Id.* at 687-88.
22  Because of the "difficulties inherent in making the evaluation," a "defendant must overcome the
23  presumption that, under the circumstances, the challenged action might be considered sound trial
24  strategy." *Strickland*, 466 U.S. at 694.

25       Thiecke argues that a competent lawyer would have objected to the multiple instances of
26  misconduct by the prosecutor in his closing arguments.  He claims that defense counsel had no
27  strategic reason for permitting the jurors to hear such an argument, or to fail to seek a curative
28  instruction from the court.  He also contends that the comments were highly prejudicial; in

19

1   particular, he argues that, given that the prosecutor's highly inflammatory vouching, at the very

2   least he is entitled to a retrial with respect to sanity.

3        The state appellate court rejected Thiecke's claims of ineffective assistance.  It noted that

4   even assuming that the prosecutor's comments were misconduct, Thiecke's failure to establish

5   the absence of a tactical purpose precluded their review on direct appeal under California law.

6   Pet. Ex. A at 28 (citing *People v. Fosselman*, 33 Cal. 3d 572, 581 (1983)).  The court noted that

7   counsel well may have believed that objections would only serve to draw attention to the

8   comments and determined that the better tactic was to let them pass.

9        Given the presumption of competence articulated in *Strickland*, the determination was

10   not unreasonable.  What Thiecke claims was improper vouching was the final thrust in a back-

11   and-forth exchange between the prosecutor and the defense attorney.  In his closing argument in

12   the guilt phase the prosecutor pointed out that Dr. Foster had received $200 an hour as a paid

13   expert, yet had failed to present a written report and had lost the notes of his evaluation of

14   Thiecke.  The prosecutor commented that "[i]f they paid me that, I would work a little harder, I

15   think."  RT 1118.  In his closing argument in the sanity phase, defense counsel responded to the

16   attacks on Dr. Foster's credibility by noting that the prosecutor was "just like me . . . . we're

17   advocates.  We advocate for our cause.  He advocates to find Mr. Theicke sane.  I advocate that

18   he be found insane."  RT 1327.  In this context, the prosecutor responded,

19         I'm a prosecutor.  I'm paid to put on the truth and do justice.  The facts in this
           case tell you that this defendant was sane. . . . when you have facts like this, when
20         they only mean one thing, that he's sane, of course its my job to present them to
           you, present them fully and fairly, and have you arrive at the appropriate
21         conclusion.

22   RT 1364.  It is by no means clear that objecting to this comment even would have been

23   appropriate.  Moreover, as the state Court of Appeal indicated, it would not be unreasonable to

24   infer that defense counsel made a tactical decision not to focus the jury's attention on the

25   prosecutor's argument.

26

27

28

Case No. 05:06-cv-0161 JF/HRL
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFLC3)

1

### III. ORDER

2     The petition for writ of habeas corpus is DENIED.

3 **IT IS SO ORDERED.**

4

5 DATED: 10/12/2010

                _____
6                 JEREMY FOGEL
                United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 05:06-cv-0161 JF/HRL
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFLC3)